Filed 3/5/26; Opinion following rehearing
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B346062 |
| Petitioner, | (Los Angeles County Super. Ct. No. SA107988) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| JOB URIAH TAYLOR, | |
| Real Party in Interest. | |


ORIGINAL PROCEEDINGS in mandate.  Lana Kim, Judge.  Petition granted.

Nathan J. Hochman, District Attorney, Tracey Whitney, Byron Beck and Jeffrey Herring, Deputy District Attorneys, for Petitioner.

No appearance for Respondent.

Erika Anzoategui, Alternate Public Defender, Michael Schensul and Nazila Shokrian, Deputy Alternate Public Defenders, for Real Party in Interest.

Galit Lipa, State Public Defender and Teresa DeAmicis, Deputy State Public Defender for Office of the State Public Defender as Amicus Curiae on behalf of Real Party in Interest.

_____

Penal Code section 1001.36[1] authorizes a court to grant pretrial diversion to a defendant with a qualifying mental disorder who agrees to comply with mental health treatment (§ 1001.36, subd. (c)(3)) and will not pose an unreasonable risk of danger to public safety "if treated in the community."  (§ 1001.36, subd. (c)(4).)

The Los Angeles County District Attorney charged Job Uriah Taylor with several counts of attempted murder and assault with a deadly weapon, alleging Taylor viciously attacked four individuals with a metal pipe.  The defense moved for mental health diversion to a community facility, supported by a psychological evaluation that Taylor suffered a treatable schizoaffective disorder but would not pose an unreasonable risk of danger to public safety "if his psychiatric symptoms were controlled with treatment."

Impliedly finding Taylor would not pose an unreasonable risk of danger to public safety if treated in a community facility, the trial court granted diversion.

The People petition for a writ vacating the court's order on the ground that no evidence suggested, and the court did not

_____

[1] Undesignated statutory references are to the Penal Code.

find, that Taylor would comply with a treatment regimen in a community facility, and therefore no evidence supported the court's finding that he would not pose an unreasonable risk of danger to public safety if granted diversion. We agree and grant the petition.

## BACKGROUND

### A. Alleged Attacks and Charges

The People allege that on the morning of March 3, 2023, Taylor, age 25, went on a violent, racially motivated rampage targeting multiple victims in Santa Monica. Taylor approached Christian Hornburg, who is Black, from behind and clubbed him over the head with a metal pipe and then stomped his head while he was on the ground, helpless. Duane Ziegler, a witness who attempted to protect Hornburg, heard Taylor say he was there to "kill that nigger."

When Jade Carter, who is also Black, tried to intervene, Taylor attacked her with the pipe and hurled racial slurs.

Footage from a police body camera showed Taylor continued his racist rant until he was arrested. Both Hornburg and Carter were transported to the hospital. Hornburg sustained life-altering injuries.

Police learned that earlier that morning, Taylor threatened Michael Okyere, who is Black, with the metal pipe and shouted racial slurs at him. Nearby firefighters intervened and chased him away.

In an amended information, the People charged Taylor with the willful, premeditated, and deliberate attempted murder of Hornburg, with special allegations that Taylor personally inflicted great bodily injury and that the offense constituted

3

a hate crime. The People also charged Taylor with three counts of assault with a deadly weapon on Okyere, Ziegler, and Carter, each count including hate crime allegations. Taylor pleaded not guilty to the charges.

## B.    Motion for Diversion

In June 2024, Taylor filed a motion for mental health diversion pursuant to section 1001.36. The motion described Taylor's abusive and troubling family history and his struggle with mental health issues beginning at the age of 12.

### 1.    *Dr. Campbell's Report*

In support of the motion, Taylor offered a psychological evaluation prepared by Robin Rhodes Campbell, PhD., who evaluated him in April 2024 in response to a referral from the alternate public defender's office. The referral asked Dr. Campbell to opine on three questions: (1) "Does the defendant suffer from a mental health condition other than antisocial personality disorder, borderline personality disorder, or pedophilia"; (2) "Would the defendant's condition respond to mental health treatment"; and (3) "Would the defendant pose an unreasonable risk of danger to public safety if treated in the community?"

Dr. Campbell reviewed the records of the 2023 incidents, including police body camera footage; the probation report; and Taylor's records from four mental health treatment providers. The records revealed that Taylor had a history of substance abuse and danger toward others and once required five-point restraints in the hospital after he attacked staff members. His mood was labile, and there "were times when he appeared to be feigning some of his symptoms, but there were also times when

4

he appeared to be presenting with very real mood instability and impulsivity."

Records from the Department of State Hospitals–Metropolitan (DSH-M) stated that Taylor was admitted to DSH-M in September 2023 for restoration of trial competency and was discharged in October 2023. He reported a history of ADHD and "bipolar schizophrenia," with psychiatric symptoms dating back to childhood, including both auditory and visual hallucinations, high energy, decreased need for sleep, and irritability. Taylor had symptoms of depression, including sadness, lack of pleasure, and disturbed sleep, and was diagnosed with "unspecified schizophrenia spectrum and other psychotic disorder, other stimulant use, unspecified, opioid use disorder, and hallucinogen abuse." He reported that medication was effective in reducing auditory hallucinations.

Records from the Iberia Medical Center indicated that Taylor presented with suicidal and homicidal ideation, agitation, hostility, and depression, and was prescribed Adderall and Seroquel. His speech was tangential, and prior to his admission he threatened his mother and destroyed the family home. Taylor was diagnosed with bipolar disorder but did not take his prescribed medication. He was transferred to Liberty Health Care Systems and participated in treatment groups in 2014, where he was diagnosed with an unspecified mood disorder and with "oppositional defiant disorder with rule out of conduct disorder and cannabis use disorder with a rule out of benzodiazepine use disorder."

Taylor's records revealed that in 2021, law enforcement officers brought him to the emergency department at St. Joseph Medical Center after he threatened bystanders with a rebar club.

The officers reported that Taylor suffered auditory and visual hallucinations and paranoia and talked to himself. Medical staff indicated he was " 'alert, yelling, and aggressive.' He was internally preoccupied and not responding to questions, talking to people who were not there, and had a labile mood. He screamed 'that he was going to kill himself for Jesus Christ, the one and only.' " After admission to the emergency department, Taylor tested positive for amphetamine, cannabis, and cocaine. He reported symptoms of post-traumatic stress disorder, including nightmares, was diagnosed with "bipolar disorder, current episode manic, severe, with psychotic features," and was treated with quetiapine for sleep, paranoia and mood swings and prazosin for nightmares.

In addition to reviewing his records, Dr. Campbell interviewed Taylor for 90 minutes. He indicated he was released from a psychiatric hospital shortly before committing the offenses alleged in the information. He did not take his prescribed medication but was using methamphetamine and PCP and had been seeing things. Taylor claimed he was robbed at gunpoint the night before he attacked Hornburg and thought Hornburg was the robber.

Taylor told Dr. Campbell that he attempted to get mental health treatment after coming to California but felt the intake clinician had a "poor attitude." Shortly before the alleged offenses, he was taken to a hospital after a psychosis-induced confrontation with a man in his own home. After discharge, he did not follow the hospital's treatment recommendations because he left them on a bus.

In answer to the referral questions, Dr. Campbell opined that Taylor suffered from a qualifying, treatable mental health

6

condition which played a significant role in the commission of the offenses.

As to whether Taylor would pose an unreasonable risk of danger to public safety if treated in the community, Campbell stated: "In my opinion, the defendant would not pose an unreasonable risk of danger to public safety *if his psychiatric symptoms were controlled with treatment.* Given that his untreated psychiatric disorder was a significant and proximal cause of his behavior at the time of the alleged offense, *if his symptoms are under good control with medication and psychosocial support*, he would not present an unreasonable risk. If the defendant abstains from substance use, his risk would be further reduced. [¶] . . . In my opinion, the defendant would not be at risk of committing any [offenses specified in section 1001.36] if treated in the community and would not present an unreasonable risk of danger to public safety." (Italics added.) Dr. Campbell reserved the right to alter her opinion upon the receipt of information contradicting the information the alternate public defender had given her.

### 2. *Opposition*

The People opposed Taylor's motion for diversion.

In support of the opposition, Dr. Chris Chen reviewed Taylor's jail medical records and interviewed him at the Twin Towers Correction Facility. The records indicated that a jail psychologist had interviewed Taylor but, due to safety concerns, did so only at Taylor's cell door. Taylor presented with " 'hostile and aggressive behaviors towards custody staff,' " had " 'poor impulse control, anxiety, and was irritable,' " exhibited rambling speech, attempted to bite his probation officer, was " 'getting into

7

fights since his incarceration,' " and had a " 'history of mood instability.' "

Dr. Chen observed that Taylor would initially be calm and cooperative but " 'when he started talking about his charges, he became increasingly angry, and deputies had to terminate the evaluation early for safety concerns.' " Dr. Chen noted that Taylor's " 'impulse control was poor, as he became increasingly irritable [and] started yelling . . . , to the point that the deputies had to escort him back to his cell due to safety concerns.' "

Reporting that the defense refused to provide the medical records upon which Dr. Campbell had relied, the People argued that based on the limited records available to them, Taylor had no history of medical compliance or follow-up to care, and each time he was released from a hospital he discontinued his medication, used drugs, and became violent.

### 3.    *Hearing on the Motion*

The hearing on Taylor's motion for mental health diversion took place over several days. Taylor argued he never had consistent mental health treatment, and since receiving consistent treatment had suffered no further incidents.

#### a.    *Dr. Montgomery's Opinion*

The trial court requested that Dr. Montgomery, from the Office of Diversion & Reentry (ODR), independently evaluate Taylor. She testified that Taylor was stable while in custody and on medication, and his mental illness would be treatable with medications and other modalities in the ODR program, including long-acting injections administered every four weeks. Dr. Montgomery testified that Taylor agreed to the recommended treatment modalities. She disagreed with the People's assertion

8

that Taylor had voluntarily stopped taking medications in the past but did not explain the basis for this disagreement.

Dr. Montgomery admitted that the ODR offered no locked program, and although staff would attempt to intervene if Taylor decided to leave an ODR facility, he would not be stopped. ODR would notify the court within 72 hours of any absence. Posing a hypothetical in which Taylor left the ODR program, the People asked Dr. Montgomery if Taylor's medication might lose efficacy, resulting in more incidents of extreme violence. Dr. Montgomery responded, "In this case, yes. I don't want to downplay the seriousness of this case. But I don't know that every manic episode he has will be like that. They can vary."

Although the People repeatedly asked Dr. Montgomery whether Taylor would pose an unreasonable risk of danger to public safety if he left an ODR facility, she declined to offer an opinion on the matter, stating she "[could not] make that prediction." The trial court discouraged continued inquiry in this line, reasoning Dr. Montgomery could not "predict the future."

The trial court denied the People's request for the medical records upon which Drs. Campbell and Montgomery had relied. Dr. Campbell did not testify at the hearing.

### b. *Taylor*

Taylor spoke at the hearing and apologized to the Black people in the room for his behavior on the day of the offenses.

### c. *Argument*

The People argued that Taylor steadfastly refused to take prescribed medications and was racist and violent when unmedicated.

9

### 4. *Ruling*

From the bench, the court granted Taylor's motion for diversion.  The court ordered residential, medically assisted treatment, ordered Taylor to comply with the ODR program's rules, set monthly appearances for progress reports, and ordered ODR to notify the court as soon as possible if there was a problem with Taylor or his medication.  The court ordered Taylor not to forgo his medication or leave the ODR program without permission and admonished him that any violation of ODR requirements would result in notification to the court.  The court made no express finding regarding any of the section 1001.36 criteria for diversion.

## C. Petition

The district attorney petitioned this court for a writ of mandate directing the trial court to vacate its order granting diversion and issue a new order denying Taylor's motion.  The People argue that no evidence supports the trial court's implicit finding that Taylor would not pose an unreasonable risk of danger to public safety if treated in the community, and thus the grant of diversion constituted an abuse of discretion.

The district attorney relies in part on Taylor's family history, in which his sister, Chloe, reported that she and his mother admitted him into mental health facilities in Louisiana as an adult "but he always signed himself out after the first 24 hours."

We temporarily stayed enforcement of the order granting mental health diversion and issued an order to show cause why a peremptory writ should not issue directing the court to vacate its order granting mental health diversion and issue a new order

10

denying diversion. Taylor filed a written return in opposition to the writ, and the People filed a reply.

The Office of the State Public Defender filed an amicus brief in opposition to the People's petition, urging us not to issue a peremptory writ for three reasons: (1) Such a writ would usurp the Legislature's authority to include certain categories of crime for diversion by effectively excluding them from diversion; (2) The writ would impermissibly limit the scope of the trial court's discretion by redefining "public safety" in a manner inconsistent with the Legislature's intent; and (3) The writ would infringe on a trial court's ability thoroughly to exercise its discretion on a case-by-case basis.

On September 20, 2025, we issued a published opinion granting the district attorney's petition. On November 26, 2025, we vacated that opinion and granted Taylor's petition for a rehearing. We invited further briefing, which the parties supplied and we have considered.

## DISCUSSION

### A. Jurisdiction

Taylor argues that we lack subject matter jurisdiction to consider the district attorney's petition because an order granting mental health diversion is unreviewable by either appeal or writ. We disagree.

A prosecutor's right to appeal in a criminal case is governed by section 1238. Under subdivision (a)(1) of that section, the People may take an appeal from "[a]n order setting aside all or any portion of the indictment, information, or complaint." (§ 1238, subd. (a)(1).) "In determining whether a specific order is appealable under this section, courts consider the form,

11

substance and effect of the order.  [Citations.]  While an order may not be specifically listed as an appealable order under section 1238, if the substance of the order has the purpose and ultimate effect of setting aside all or any portion of the indictment, information, or complaint, then the order is appealable under section 1238, subdivision (a)(1)." (*People v. McClaurin* (2006) 137 Cal.App.4th 241, 247.)

Section 1001.36, subdivision (f)(1) defines pretrial diversion as the "postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment."  If the defendant substantially complies with diversion requirements, avoids significant new violations of law unrelated to the defendant's mental health condition, and has a plan in place for long-term mental health care, the court "shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion."  (§ 1001.36, subd. (h).)  The Legislature designed diversion to end criminal prosecution for those who substantially comply with their diversion terms, while protecting public safety.  (See section 1001.35, subd. (a).)

Pursuant to subdivision (f)(1) of section 1001.36, the substance of an order granting mental health diversion has the purpose and ultimate effect of setting aside an information or complaint at least temporarily, and potentially permanently depending on the defendant's performance in diversion.  The order is therefore appealable pursuant to subdivision (a)(1) of section 1238.

12

When an order is appealable by the People, a writ of mandate may be granted when there is no plain, speedy, and adequate remedy at law and the lower court had an obligation to perform an act in a manner prescribed by law but failed to do so. (*People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1295.)

We turn to whether the trial court failed to act in a manner prescribed by law.

## B.   Mental Health Diversion

The district attorney contends no evidence supported the court's implicit finding that Taylor would not pose an unreasonable risk of danger to public safety if granted diversion, and thus the grant of diversion constituted an abuse of discretion. We agree.

### 1.   *Mental Health Diversion Statutes*

Section 1001.36 authorizes pretrial mental health diversion to a defendant with a qualifying mental disorder.  The statute defines " 'pretrial diversion' " as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment."  (§ 1001.36, subd. (f)(1).)

The stated purpose of the statute "is to promote all of the following:  [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety.  [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings.  [¶]

13

(c) Providing diversion that meets the unique mental health treatment and support needs of individuals with mental disorders."  (§ 1001.35, subds. (a)–(c).)

A defendant is eligible for pretrial diversion if (1) the defendant suffers from a qualifying mental disorder and (2) the disorder played a significant role in the commission of the charged offense.  (§ 1001.36, subd. (b)(1) & (2).)  A defendant charged with certain crimes, such as murder and rape, is ineligible for diversion.  (§ 1001.36, subd. (d).)

If a defendant satisfies these eligibility requirements, the court may deem him or her suitable for pretrial diversion if the following criteria are met:  (1) The defendant's symptoms will respond to mental health treatment (§ 1001.36, subd. (c)(1); (2) The defendant consents to diversion and waives his or her right to a speedy trial (§ 1001.36, subd. (c)(2)); (3) The defendant agrees to comply with treatment (§ 1001.36, subd. (c)(3)); and (4) The defendant "will not pose an unreasonable risk of danger to public safety, as defined in Section 1170.18, if treated in the community."  (§ 1001.36, subd. (c)(4).)

A hearing on the suitability for diversion "shall be informal and may proceed on offers of proof, reliable hearsay, and argument of counsel."  (§ 1001.36, subd. (e).)  "The court may consider the opinions of the district attorney, the defense, or a qualified mental health expert, and may consider the defendant's treatment plan, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate."  (§ 1001.36, subd. (c)(4).)

"If the defendant makes a prima facie showing that he or she meets all of the threshold eligibility requirements and the defendant and the offense are suitable for diversion, and the

14

trial court is satisfied that the recommended program of mental health treatment will meet the specialized mental health treatment needs of the defendant, then the court may grant pretrial diversion." *(People v. Frahs* (2020) 9 Cal.5th 618, 627 *(Frahs*); see also § 1001.36, subds. (a), (b) & (c).)

In deciding whether a defendant meets the criteria for diversion, "the 'strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the offending individual and the community' should inform a trial court's discretion." (*Vaughn v. Superior Court* (2024) 105 Cal.App.5th 124, 138.)

The maximum period of diversion is two years. (§ 1001.36, subd. (f)(1)(C)(i).) "If the defendant is subsequently charged with an additional crime, or otherwise performs unsatisfactorily in the assigned program, then the court may reinstate criminal proceedings." (*Frahs*, *supra*, 9 Cal.5th at p. 627; see also § 1101.36, subd. (g).) "If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion." (§ 1001.36, subd. (h).)

### 2.    *Standard of Review*

A ruling on a motion for mental health diversion is reviewed for abuse of discretion, and the factual underpinnings of that decision are reviewed for substantial evidence. (*People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1147 (*Whitmill*).)

### 3.    *Application*

On appeal, only one of the six prongs in section 1001.36 is at issue, namely that Taylor "will not pose an unreasonable

risk of danger to public safety . . . if treated in the community." (§ 1001.36, subd. (c)(4).)  The court made no express finding on this issue, but its grant of diversion necessarily included an implicit finding that Taylor would not pose an unreasonable risk if granted diversion.

" '[U]nreasonable risk of danger to public safety' means an unreasonable risk that the petitioner will commit a new violent felony within the meaning of clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667." (§ 1170.18, subd. (c).)  That clause lists felonies including "(IV) Any homicide offense, including any attempted homicide offense, defined in Sections 187 to 191.5, inclusive." (§ 667, subd. (e)(2)(C)(iv)(IV).)

In *Whitmill*, *supra*, 86 Cal.App.5th 1138, Division Eight of this district reversed an order denying diversion where the trial court found the defendant would present such an unreasonable risk.  The defendant was charged with possession of a firearm by a felon, discharge of a firearm with gross negligence, and criminal threats stemming from an incident in which the defendant, an honorably discharged veteran diagnosed with a severe mental disorder, threatened to kill his girlfriend and others nearby, fired a shot into the air, then threw the gun away and turned himself in to law enforcement.  The defendant had no prior history of violence.  (*Id*. at pp. 1150–1154.)

*Whitmill* distinguished the opinion of Division Six of this district in *People v. Pacheco* (2022) 75 Cal.App.5th 207 (*Pacheco*), which *affirmed* an order denying diversion in which the trial court concluded that the defendant presented an unreasonable risk to public safety.  In *Pacheco*, *Whitmill* stated, the defendant "deliberately set a forest fire near a homeless encampment and ranch, which could have created a mass casualty event as

16

it required 15 firefighting units, helicopters, and a specialized airplane. This is unlike [Whitmill] who negligently fired a single shot in the air away from those nearby and then threw the gun away and turned himself in to [law enforcement] with 'no incident.' [¶] The expert in *Pacheco* opined that if the defendant ' "does not take his antipsychotic medication as prescribed and/or returns to using methamphetamine, then he would become unstable and psychotic and be likely to reoffend in some bizarre manner." ' " (*Whitmill*, *supra*, 86 Cal.App.5th at p. 1155.)

Here, no expert nor any other evidence suggested that Taylor would not pose an unreasonable risk of danger to public safety if granted diversion.

Dr. Campbell concluded only Taylor would not pose an unreasonable risk of danger to public safety "if his psychiatric symptoms were controlled with treatment" and "if his symptoms are under good control with medication and psychosocial support." Dr. Campbell was not asked and did not say that control of Taylor's psychiatric symptoms was likely.

Nor did Dr. Montgomery, who testified only that Taylor was eligible for ODR services. Dr. Montgomery acknowledged that if Taylor were to leave the unlocked facility and fail to take his medication he would be at risk of engaging in violent behavior.

In contrast to the lack of evidence that Taylor would not pose a risk if granted diversion, substantial evidence either exists or was available that he would pose such a risk. Taylor had a history of departing facilities without completing treatment. For example, his sister reported that although she and his mother admitted him into mental health facilities in Louisiana as an adult, "he always signed himself out after the

17

first 24 hours." Taylor also had a history of noncompliance with his psychiatric medication regimen. According to records from the Iberia Medical Center, he refused to take prescribed medication. Taylor admitted to Dr. Campbell that he attempted to get mental health treatment after coming to California but was unsuccessful because he felt that an intake clinician had a "poor attitude," and further admitted he was released from a hospital shortly before the instant alleged offense but failed to follow treatment recommendations.

In sum, the court made no express finding that Taylor would not pose an unreasonable risk of danger to public safety if granted diversion—indeed, the court concluded witnesses could not "predict the future"—and no evidence supported any implied finding to this effect. On the other hand, the record supports a reasonable inference that Taylor would abandon aspects of the mental health regimen experts testified were crucial for him not to pose an unreasonable danger to the public, with potentially catastrophic consequences. We therefore conclude that no substantial evidence supports the court's implied finding that Taylor was suitable for mental health diversion, and its grant of diversion was thus an abuse of discretion.

Taylor and the Office of the State Public Defender argue that to deny diversion in this case would create a new rule "that would establish an abuse of discretion in every case in which a serious injury was inflicted, racially biased language was used, or a hate crime is charged," and create an "undefined threshold of 'horribleness' " "unrelated to whether a defendant poses an unreasonable risk of committing a new violent 'super strike' felony." We disagree.

We acknowledge that this case presents an admittedly horrific scenario that contrasts starkly with that presented by *Whitmill*, where diversion was held to be appropriate, and is more akin to that presented in *Pacheco*, where it was not. Here, Taylor attacked individuals for no reason other than the color of their skin. Several were traumatized and two were hospitalized, including Hornburg, who was ambushed with a metal pipe and then stomped on as he lay helpless on the ground, suffering life altering injuries. This was not the first time Taylor attacked people with a metal pipe for no reason, and no evidence suggested it would be the last.

But our reasoning turns not on the horribleness of Taylor's alleged actions but on the likelihood he will repeat them if he abandons his newly efficacious mental health regimen. The People have steadfastly raised this concern at all stages in these proceedings and nothing in the record provides a satisfactory answer.

Although by its express terms section 1001.36 authorizes diversion to a defendant who agrees to treatment, the requirement that the defendant not pose an unreasonable danger to public safety implicitly obligates the court to determine whether the defendant will follow through on this agreement. No evidence here suggests that Taylor will follow through and the court made no finding that he would, instead finding that mental health professionals could not predict the future. Taylor's history of departing facilities without completing treatment and the temporary effects of his current medication indicate he would pose an unreasonable risk if granted diversion to a voluntary mental health program. Indeed, he was just released from a psychiatric facility when he thereafter failed to

take his medications and committed the crimes that are the subject of this appeal.

Taylor argues that requiring a trial court to determine whether a defendant will follow through on an agreement to be treated in the community would create a new, nonstatutory element to the suitability analysis under section 1001.36. We disagree. The obligation to determine whether a defendant will pose an unreasonable risk of danger to the public if granted diversion necessarily includes determining whether the defendant will abandon treatment.

We recognize the Legislature's "strong legislative preference for treatment of mental health disorders" (*Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892–893) and thus the need not to unduly restrict diversion. For example, "if diversion may be denied because a professional conditions their opinion on treatment compliance, it opens the possibility that entire categories of persons who otherwise meet all eligibility and suitability criteria, including expressing a willingness to comply with the recommended treatment, will be denied diversion even without any evidence of prior noncompliance." (*People v. Cabalar* (2025) 117 Cal.App.5th 41, 57.) But where there is no evidence of prior compliance with treatment, and on the contrary a history of noncompliance, the trial court must take the possibility of future noncompliance into account.

20

## DISPOSITION

The petition is granted.  Let a peremptory writ of mandate issue directing the superior court to vacate its order granting petitioner's motion for mental health diversion and enter a new order denying the motion.  Our May 12, 2025 order temporarily staying enforcement of the order granting diversion shall be vacated on the date this opinion becomes final.

CERTIFIED FOR PUBLICATION.


                                        ROTHSCHILD, P. J.

We concur:



BENDIX, J.



M. KIM, J.